UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
RONALD A. NIMKOFF,

                          Plaintiff,

             - against -

GARTH H. DRABINSKY and MYRON I.
GOTTLIEB,

                          Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
17-CV-4458 (PKC) (RLM)

PAMELA K. CHEN, United States District Judge:

Plaintiff Ronald A. Nimkoff, an attorney proceeding *pro se*, brought this diversity action against Defendants Garth H. Drabinsky and Myron I. Gottlieb, two former clients, to enforce a promissory note in which Defendants promised to pay Plaintiff a certain sum of money upon Plaintiff's demand. Plaintiff presently moves for summary judgment as to Defendant Drabinsky on Count One of the Complaint, which seeks recovery of the principal and interest due under the promissory note.[1] For the following reasons, Plaintiff's motion for partial summary judgment is granted.

## BACKGROUND

### I.    Factual Background

Plaintiff is a citizen of the United States and an attorney licensed to practice in New York. (*See* Plaintiff's Local Rule 56.1 Statement ("Pl.'s 56.1"), Dkt. 112, ¶ 1; Defendant's Local Rule

---

[1] As discussed below, Plaintiff's Complaint also seeks recovery of attorneys' fees and costs under the terms of the promissory note. (*See generally* Complaint, Dkt. 1.) Plaintiff does not move for summary judgment as to Defendant Drabinsky on that portion of the Complaint at this time. (*See generally*, Notice of Motion, Dkt. 112, at ECF 1.) Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

56.1 Statement ("Def.'s 56.1"), Dkt. 113, ¶ 58.)[2]   Defendant Drabinsky and Co-Defendant

Gottlieb, former business partners, are Canadian citizens who live in Canada.  (Pl.'s 56.1, Dkt.

112, ¶ 2; *see also* Def.'s 56.1, Dkt. 113, ¶¶ 42–43.)  By a retainer agreement dated August 16, 2001

(the "2001 Retainer Agreement"), Drabinsky and Gottlieb retained Plaintiff's firm—then named

Schechter & Nimkoff, LLP—to defend them in several securities class actions pending in the

United States District Court for the Southern District of New York (the "Class Actions").[3]  (Pl.'s

56.1, Dkt. 112, ¶ 4; *see also* 2001 Retainer Agreement, Dkt. 112-6, at ECF 1.)  Both Drabinsky

and Gottlieb signed the 2001 Retainer Agreement, which states that "each of you agrees to be

jointly and severally liable for the costs accrued for services and expenses under the terms of this

agreement."  (2001 Retainer Agreement, Dkt. 112-6, at ECF 2–3.)

---

[2]   Unless otherwise noted, a standalone citation to a party's Local Rule 56.1 statement denotes that the Court has deemed the underlying factual allegation undisputed.  Any citation to a Rule 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document.  The Court has deemed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed.  *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything.").  Additionally, to the extent a party's Rule 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement.  *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012).

[3]   The Class Actions included the following actions: (i) *Griffin v. PaineWebber Inc.*, No. 99-CV-2292 (VM) (S.D.N.Y. filed Mar. 26, 1999); (ii) *Rieger v. Drabinsky*, No. 99-CV-9425 (VM) (S.D.N.Y. filed Sept. 1, 1999); (iii) *In re Livent, Inc. Noteholders Sec. Litig.*, No. 98-CV-8161 (VM) (S.D.N.Y. filed Oct. 9, 1998); (iv) *In re Livent, Inc. Sec. Litig.*, No. 98-CV-5686 (VM) (S.D.N.Y. filed Aug. 11, 1998).  (*See* Pl.'s 56.1, Dkt. 112, ¶ 4.)  Defendant Drabinsky was the Chief Executive Officer of theater-production company Livent, Inc., from 1989 to 1998.  (Def.'s 56.1, Dkt. 113, ¶ 47.)

In January 1999, the Securities and Exchange Commission filed a separate action against Drabinsky and Gottlieb in the Southern District of New York (the "SEC Action").[4]  By a second retainer agreement dated June 2, 2005 (the "2005 Retainer Agreement"), Drabinsky and Gottlieb retained Plaintiff's firm—which by then had been renamed Nimkoff Rosenfeld & Schechter, LLP (the "Nimkoff Firm")—to defend them in the SEC Action.  (Pl.'s 56.1, Dkt. 112, ¶ 5; *see also* 2005 Retainer Agreement, Dkt. 112-10, at ECF 1.)  The Nimkoff Firm represented Drabinsky and Gottlieb in the Class Actions and SEC Action for several years.[5]  (*See* Pl.'s 56.1, Dkt. 112, ¶ 6.)

At some point, Drabinsky and Gottlieb accrued unpaid legal fees in connection with the various legal services provided by Plaintiff and Plaintiff's firm.  Accordingly, on September 12, 2005, Drabinsky and Gottlieb executed a promissory note, dated August 31, 2005, promising to pay $193,079.91 with no interest and agreeing that they would be "jointly and severally liable" for this obligation.  (*See* August 31, 2005 Promissory Note ("2005 Note"), Dkt. 112-12, at ECF 2–3, 5–6; *see also* Pl.'s 56.1, Dkt. 112, ¶ 9.)  Eighteen months later, Drabinsky and Gottlieb both signed a letter dated March 16, 2007, acknowledging that each of them was "jointly and severally responsible" for an outstanding debt to the Nimkoff Firm in the amount of $211,566.52.  (*See* March 16, 2007 Letter, Dkt. 112-13, at ECF 2–3; *see also* Pl.'s 56.1, Dkt. 112, ¶ 10.)  A few months later, Drabinsky and Gottlieb signed a memorandum re-acknowledging an obligation of $211,566.52 and purporting to establish a schedule to pay off this obligation over a period of 30 months.  (*See* July 18, 2007 Memorandum, Dkt. 112-14; *see also* Pl.'s 56.1, Dkt. 112, ¶ 11.)

---

[4]  *SEC v. Drabinsky*, No. 99-CV-239 (TPG) (S.D.N.Y. filed Jan. 13, 1999).  (*See* Pl.'s 56.1, Dkt. 112, ¶ 5.)

[5]  Plaintiff continued to identify himself as counsel of record in the SEC Action as late as June 2012.  (Def.'s 56.1, Dkt. 113, ¶ 6.)

On October 8, 2009, Drabinsky and Gottlieb executed another promissory note (the "2009 Note"). (Pl.'s 56.1, Dkt. 112, ¶ 12.) Under the terms of the 2009 Note, Drabinsky and Gottlieb promised to pay, upon demand, $185,969.45 to the Nimkoff Firm, "together with interest at the rate of twelve percent (12%) per annum (one percent (1%) per month), compounded monthly."[6] (*Id.*; 2009 Note, Dkt. 112-15, at ECF 1.) Additionally, Drabinsky and Gottlieb authorized any holder of the note, in the event of a default, "to proceed immediately against [them], jointly and severally, for the full amount due (including interest), as well as for the holder's costs and attorneys' fees incurred in doing so." (2009 Note, Dkt. 112-15, at ECF 1.) According to Drabinsky, the 2009 Note represented a "continuing indication of a good faith intent" by him and Gottlieb to try to pay Plaintiff for past services, despite not having the immediate ability in 2009 to make any payments to Plaintiff or Plaintiff's firm. (*See* Def.'s 56.1, Dkt. 113, ¶¶ 78–79.)

For nearly six years, Plaintiff made no demand for payment under the 2009 Note, nor does it appear that Drabinsky or Gottlieb made any payments to Plaintiff. (*See* Def.'s 56.1, Dkt. 113, ¶¶ 144–45; *see also* Dkt. 112-16, at ECF 4–6.) In that time, Drabinsky was indicted in Canada and convicted of criminal charges based on the conduct underlying the SEC and Class Actions, and he served approximately 18 months of a five-year sentence in prison. (Def.'s 56.1, Dkt. 113, ¶¶ 49–54.)

While on parole in 2015, Drabinsky was diagnosed with stage IV melanoma that had spread to his lungs. (*Id.* ¶¶ 82, 86.) In May 2015, Drabinsky underwent surgery to remove cancerous lymph nodes, and thereafter began a regime of immunotherapy using the drug Yervoy. (*Id.*

---

[6] Drabinsky points out that the principal amount of the 2009 Note is lower than the amount stated in the 2007 memoranda because payments were made in the interim. (Def.'s 56.1, Dkt. 113, ¶¶ 12, 76.) Drabinsky avers that he and Gottlieb have paid a total of $393,000 to Plaintiff and Plaintiff's firm. (*Id.* ¶ 65; *see also* Pl.'s 56.1, Dkt. 112, ¶ 7 ("Drabinsky and Gottlieb paid some of those invoices for legal fees [and] failed to pay such other invoices . . . .").)

¶¶ 102–03.)   After starting treatment with Yervoy, Drabinsky suffered severe colitis, or inflammation of the colon, from the drug, and was hospitalized for two weeks in June 2015.  (*See id.* ¶¶ 110–14.)  To treat the colitis, doctors gave Drabinsky—in his words—"massive amounts" of the steroid prednisone, which "greatly impacted [him] psychologically."  (*See id.* ¶¶ 117–27.)  By August 12, 2015, however, Drabinsky had been weaned down to 5 milligrams of prednisone per day.  (*See* Plaintiff's Reply Declaration ("Pl.'s Reply"), Dkt. 117, ¶¶ 20–25; *see also* Deposition of Dr. David Hogg ("Hogg Dep."), Dkt. 116-14, at Tr. 77:6–19.)  Around the same time, Drabinsky began a new regime of immunotherapy using the drug Keytruda.  (*See* Def.'s 56.1, Dkt. 113, ¶ 130.)  This new treatment caused him "fatigue."  (*See id.* ¶ 142; Hogg Dep., Dkt. 116-14, at Tr. 184:6–191:11; *see also* Dkt. 116-16, at ECF 2.)  Nonetheless, Drabinsky continued "working full days" during this period.  (Dkt. 116-16, at ECF 2; *see also* Hogg Dep., Dkt. 116-14, at Tr. 97:2–98:5; Pl.'s Reply, Dkt. 117, ¶ 30.)

On August 26, 2015, Plaintiff made a demand to Drabinsky and Gottlieb for payment of $376,928.65—$185,969.45 in principal and $190,959.20 in interest—under the 2009 Note.  (Pl.'s 56.1, Dkt. 112, ¶ 13; *see also* August 26, 2015 Demand, Dkt. 112-16, at ECF 1, 4.)  Approximately a week later, on September 4, 2015, Plaintiff and Drabinsky had a telephone conversation, which Plaintiff surreptitiously recorded.[7]  (*See* Pl.'s 56.1, Dkt. 112, ¶ 14; Def.'s 56.1, Dkt. 113, ¶ 156.)  While speaking with Plaintiff, Drabinsky disclosed that he had stage IV melanoma and was

---

[7]  Plaintiff states that the reason for recording his telephone conversations with Drabinsky, and with Drabinsky's Canadian lawyer, John Koch, is that Plaintiff "was concerned that Drabinsky, who, on information and belief, has served prison time for fraud and forgery, would try to 'pull something' in response to [Plaintiff's] demand for payment under the October 8, 2009 promissory note."  (Affidavit in Support of Motion for Summary Judgment ("Nimkoff Aff."), Dkt. 112-1, ¶ 16 n.3.)  With his motion papers, Plaintiff submitted CD-ROMs containing audio files of the recorded conversations, as well as of various voicemails left by Drabinsky and Koch.  (Nimkoff Aff. Exs. P, V, W, X, CC, DD, EE, and FF.)  The Court has reviewed all of these audio recordings.

"heavily involved" in immunotherapy.  (Def.'s 56.1, Dkt. 113, ¶ 157.)  The two then discussed
Plaintiff's demand for payment, Drabinsky's ability to pay, and the statute of limitations with
respect to Plaintiff's ability to enforce the 2009 Note:

> DRABINSKY: . . . Here's the point Ron—okay—and then, of course, there was
> the $38,000,000 judgment against me, as you well know, and against Myron
> [Gottlieb], and the class action judgment, and they came up to Canada and they got
> execution and we took it to appeal and we lost on the appeal.
>
> PLAINTIFF:  I know.
>
> DRABINSKY:  Really got f[—]d over badly here.  Okay?
>
> PLAINTIFF:  I'm not denying that.  I have no grounds to deny that at all.
>
> DRABINSKY:  Yeah, so it hasn't been fun.
>
> PLAINTIFF:  The $38,000,000 judgment was based unfortunately on American
> Securities Law that comes close—comes very close to being a strict liability statute.
>
> DRABINSKY:  Right.  Exactly.
>
> PLAINTIFF:  And I understand that.  We understood that then.
>
> DRABINSKY:  The problem is, of course, that I am—we had no ability to defend
> ourselves and we just got killed.  So, you know, it's been not fun.  Life is not very
> good.  And I am trying to slowly make a comeback.  I don't have it in hand yet.
> You will obviously know when I have it in hand because the press will not leave
> me alone.  The moment I have a successful show happening, I will be happy to give
> you the money that I owe you, but I have borrowed money every day of my life for
> the last 17 years, Ron, in order to stay alive.
>
> PLAINTIFF:  I understand, Garth.  I mean, I am hopeful—I am certainly willing to
> try to work together on this.  Unfortunately, I am not in a position—I wish I were—
> but I have gone through hardships, too, which I don't mean to bore you with.  You
> have your own hardships, I understand.  But I am not in a position where I could
> just walk away from this.  I wish I had millions of dollars that I could just walk
> away from this.
>
> DRABINSKY:  Well, I don't know where Myron is financially.  I mean, we are
> both in bad shape.
>
> PLAINTIFF:  And I have statute of limitations concerns.
>
> DRABINSKY:  Well, what day was the note made?
>
> PLAINTIFF:  October.

> DRABINSKY:  Of what?
>
> PLAINTIFF:  Of '09.
>
> DRABINSKY:  And what would be the limitations?  Six years?
>
> PLAINTIFF:  Six years.
>
> DRABINSKY:  So how do we extend the limitation [*sic*] so we don't put you in that place?  I don't want to see you suffer, but I don't have any ability to give you any money right now.  These checks would just bounce and go crazy.  I don't want to do that, but I believe that within the next 12 months I will have the ability to help you.
>
> PLAINTIFF:  Well, you could sign another promissory note.
>
> DRABINSKY:  Well, okay, but I only want to do it for my share.  I don't want to do it for Myron's share.
>
> PLAINTIFF:  Well, you guys are jointly and severally.
>
> DRABINSKY:  Well, you have to get him to sign it, then, okay?  I'm happy to do that.  You call him directly and say that I will extend it if he extends it.
>
> PLAINTIFF:  But I can't—I mean, you will extend it jointly and severally.
>
> DRABINSKY:  Yeah, I will do that, but I can't tell you that I am going to be able to give you more than half of that money.  But even if I give you half of that money, at some point that will be a big thing, because a great deal of it is interest.  Okay?
>
> PLAINTIFF:  I understand. . . .

(*Id.*[8] (emphasis omitted); *see also* Deposition of Ronald Nimkoff ("Nimkoff Dep."), Dkt. 116-12, at Tr. 139:5–143:11.)   Plaintiff and Defendant Drabinsky ended their September 4, 2015 conversation with Drabinsky telling Plaintiff to call him once Plaintiff had spoken to Gottlieb. (Def.'s 56.1, Dkt. 113, ¶ 157; *see also* Nimkoff Dep., Dkt. 116-12, at Tr. 152:17–23.)

On September 15, 2015, Plaintiff emailed both Drabinsky and Gottlieb a new promissory note for them to execute jointly and severally (the "2015 Note").  (Pl.'s 56.1, Dkt. 112, ¶ 17; *see also* Dkt. 112-18, at ECF 1–3.)

---

[8] Plaintiff provided written transcriptions of the recorded conversations and messages, the accuracy of which Drabinsky does not dispute.

On September 21, 2015, Plaintiff and Drabinsky had another telephone conversation, which Plaintiff also recorded.  (*See* Pl.'s 56.1, Dkt. 112, ¶ 21; *see also* Def.'s 56.1, Dkt. 113, ¶ 158; Nimkoff Aff. Ex. V.)  During this conversation, Drabinsky appeared to take the position that he was unwilling to sign a new note jointly and severally:

> DRABINSKY: . . . I haven't had any word yet whether Myron [Gottlieb] is signing this document or not.
>
> PLAINTIFF:  Myron—I can tell you.  Myron says he's going to sign it, but he doesn't want to sign it alone.  He says that once I have it from you, he will send it to me.
>
> DRABINSKY:  Okay.  Well, here's the thing.  I can't sign a joint and several document because Myron is—we are both financially insolvent right now, but I have a chance of making money for the future, and I will not obtain Myron's debts. I have gone broke by paying Myron's debts off, Ron.  I will sign a several document—a several note to you as long as it has a term on it you're not going to do anything precipitous because I cannot deal with anything right now.  That will put me right over.
>
> PLAINTIFF:  I can't do that, Garth.  The current note is joint and several.
>
> DRABINSKY:  I understand that, but I am not going to support any further with Myron.  I can't do it, you know, if I have to get into all sorts of issues, I can't do it.
>
> PLAINTIFF:  It's already done.
>
> DRABINSKY:  Okay.  Well, then, it's done.  Then, I guess, if you want to sue on that note, you're going to sue on that note.  If you want a clean note, you have a clean note, you know.  I can't do it.  I cannot do it.  Myron has no ability to pay, that's why he signed anything; as long as it's joint and several with my name on it, he doesn't give a s[—]t.  I have gone broke dealing with this.
>
> PLAINTIFF:  But all you're doing, Garth, is forcing my hand, which I don't really—you know—
>
> DRABINSKY:  I can't sign a joint and several.  Just agree you're not going to pursue me for more than half.
>
> PLAINTIFF:  But you already did sign a joint and several.
>
> DRABINSKY:  I understand that, and at that time Myron was working.  He doesn't work anymore.
>
> PLAINTIFF:  So, you mean, I'm supposed to waive the joint and several on half of the outstanding amount?

8

DRABINSKY:  Listen to me right now, okay, if you're going to pursue me, you're going to pursue me.  I'm just going to go bankrupt.  Okay?  So whatever you want to do.  If you want to do something on a proper basis, you do it on a proper basis.  I don't have the ability to deal with this.  I have no assets.  I have no assets.

PLAINTIFF:  Well, you're still Garth Drabinsky.

DRABINSKY:  Well, that may be, then you have to wait, but if I am still Garth Drabinsky, then even half a loaf is a good loaf.

PLAINTIFF:  Garth, you're putting me in an untenable position.

DRABINSKY:  I am in an untenable position right now, Ron.  I don't know what I can do.  I can't sign him.  I'm not going to sign a new joint and several note.  I'm not.

PLAINTIFF:  Okay.

DRABINSKY:  I'm sitting here right now, I [have] cancer, do you understand that?

PLAINTIFF:  You know what, Garth, I have cancer, too, and I have—

DRABINSKY:  Okay.  I'm in much different—I'm in stage 4.

PLAINTIFF:  And I have issues also, financial issues.

DRABINSKY:  But this isn't going to help you.  Going after me is going to help you get zero.  That's not the answer.  I don't have anything.

PLAINTIFF:  So what's the answer?

DRABINSKY:  The answer is to absolutely deal with me on a straight-up basis—on a several basis and then at least in a good faith basis, I can start looking at this thing, and probably within 12 months or less, start making payments to you, which is a whole different proposition.  You pursue me on a joint and several note, I am going broke, that's it, it's over, and you will have zero, zero.

PLAINTIFF:  Well, I mean, if you haven't filed bankruptcy by now, you're going to file bankruptcy over me?  We both know that's not true.

DRABINSKY:  Listen to me, I don't have any money.  If you start pursuing me, I don't have any money.  I don't have it.

PLAINTIFF:  Okay.

DRABINSKY:  What are you going to do, gar[n]ish my wages for $1,000 or $10,000?  You're going to do that, tarnish me when I don't have a dollar?  Right now I have to borrow every day to stay alive.  I have been borrowing every day to stay alive for 17 years right now.  Do you understand that?  Do you understand that?

PLAINTIFF:  I do understand.  I understand what you've said.  I also know that you have benefactors.

DRABINSKY:  I don't have benefactors.  I have benefactors that lend me money to be able to pay the ongoing cost of an overhead and to eat.  That's what I have.  I don't live fancily.  Now, if Myron can show you his evidence to be able to pay, that's great, get him to sign a note, too.  You don't have to worry about it.  He will pay.

* * *

PLAINTIFF:  Garth, I can't do what you're asking me to do.

DRABINSKY:  Ok.  Well, so, what are you going to do, sue?

PLAINTIFF:  I guess.

DRABINSKY:  Well, if you sue, you sue.  What are you going to get for it?

PLAINTIFF:  I will get a judgment.

DRABINSKY:  Okay.  And then what?

PLAINTIFF:  I don't know.

DRABINSKY:  Okay.  Ron, you get a judgment and to start redoing this note all over again, put a term on it, put a five-year term on it, then, on a joint several basis.  Don't put it on demand.  Believe me, if I'm able to live for five years, I would be thrilled to write you a check if I'm alive five years from now because I will have the money.  Where I've been, I've come out.  Right now I have been in the abyss of abysses.  Give me a term on the note.

PLAINTIFF:  Well, I can't do that, but what I—

DRABINSKY:  Make your demand.

PLAINTIFF:  But obviously, Garth, I haven't come after you, you know, in the last six years, right?

DRABINSKY:  Ron, you know Myron has cancer, too; do you know that?

PLAINTIFF:  I understand.  We all have cancer.  I understand that.

DRABINSKY:  It's a f[—]g joke.

PLAINTIFF:  I feel for all of us, I do.

DRABINSKY:  Sick, it's sick.

PLAINTIFF:  Believe me, cancer is not—

DRABINSKY:  Get Myron to—you have to give a term and make it on demand.

PLAINTIFF:  It's on demand now, Garth, and I haven't—

DRABINSKY:  I'm not going to start all over again.  Okay?  I'm not going to.  This is craziness.  We are talking honestly, then let's talk honestly.  Put a term on it.  Put 24 months on it, at least there's a term, and joint and several, and when Myron's lawyer—get Myron's lawyer to say he's got Myron's signature to my lawyer because they have spoken.  My lawyer has spoken to Myron's lawyer.  Let the two lawyers keep the signatures and then exchange it with you.

PLAINTIFF:  Garth, I don't understand.  I don't understand the rationale.

DRABINSKY:  I can't have any more pressure.  I just can't.

(Def.'s 56.1, Dkt. 113, ¶ 158 (emphasis omitted); *see also* Nimkoff Dep., Dkt. 116-12, at Tr. 161:20–171:17.)  Drabinsky ended the phone call by saying that he had "to go to a meeting" and that he would "speak to [his] lawyer" and call Plaintiff the next morning.  (Def.'s 56.1, Dkt. 113, ¶ 158; *see also* Nimkoff Dep., Dkt. 116-12, at Tr. 175:21–23.)  Later that same day, Plaintiff received a call from and spoke with Drabinsky's Canadian attorney, John Koch.  (Pl.'s 56.1, Dkt. 112, ¶¶ 22–23; *see also* Nimkoff Aff. Ex. W (message from Koch); Nimkoff Aff. Ex. X (conversation with Koch).)  Koch indicated that he had spoken to Drabinsky after the conversation between Plaintiff and Drabinsky earlier in the day.  (*See* Nimkoff Ex. X, at 05:28–05:33.)[9]

The following day, Plaintiff received an email from Koch that attached a copy of the 2015 Note signed by Drabinsky and notarized by Koch.  (Pl.'s 56.1, Dkt. 112, ¶ 25; *see also* 2015 Note, Dkt. 112-23.)  Under the terms of the 2015 Note, Drabinsky and Gottlieb acknowledged that they were "jointly and severally" indebted to Nimkoff, as successor in interest to the Nimkoff Firm, in the sum of $376,928.65.  (2015 Note, Dkt. 112-23, at ECF 2.)  Drabinsky and Gottlieb also agreed

---

[9]  Drabinsky argues that Plaintiff's telephone conversation with Koch on September 21, 2015, should be excluded as inadmissible compromise negotiations under Federal Rule of Evidence 408(a).  (Defendant's Memorandum of Law Opposing Motion for Summary Judgment ("Def.'s Mem."), Dkt. 114, at 21–23.)  Plaintiff's conversation with Koch on September 21, 2015 is not a compromise negotiation that falls under Rule 408(a) because that conversation did not include any attempt at settlement.

to pay Plaintiff such sum, "together with interest, from August 26, 2015, at the rate of twelve percent (12%) per annum (one percent (1%) per month), compounded monthly," upon demand, which may be made via email.  (*Id.*)  Like the 2009 Note, the 2015 Note provides that in the event of a failure to pay, Plaintiff may "proceed immediately against [Drabinsky and Gottlieb], jointly and severally, for the full amount due (including interest), as well as for the . . . costs and attorneys' fees incurred in doing so."  (*Id.*)  Although Drabinsky acknowledges that he signed the 2015 Note on September 22, 2015, he avers that he "was under a tremendous amount of medical extremis pressures, and drugs and other levels of emotional anxiety at the time," and he signed the 2015 Note "to stop Plaintiff's harassment."  (Def.'s 56.1, Dkt. 113, ¶¶ 25, 161; *see also* Deposition of Garth H. Drabinsky ("Drabinsky Dep."), Dkt. 112-7, at Tr. 165:25–166:13.)

On August 1, 2016, approximately ten months after the 2015 Note was executed, Plaintiff sent an email to both Drabinsky and Gottlieb demanding full payment under the 2015 Note.  (Pl.'s 56.1, Dkt. 112, ¶ 28; *see also* August 1, 2016 Demand, Dkt. 112-25, at ECF 1.)  Drabinsky did not make any payments to Plaintiff.  (*See* Pl.'s 56.1, Dkt. 112, ¶ 29; *see also* Def.'s 56.1, Dkt. 113, ¶¶ 29, 196.)

## II.     Procedural History

On July 28, 2017, Plaintiff, proceeding *pro se*, commenced this action against Defendants Drabinsky and Gottlieb.  (*See generally* Complaint, Dkt. 1.)  Plaintiff's Complaint asserts two claims: (1) that Defendants are jointly and severally liable for the principal and interest due under the 2015 Note; and (2) that Defendants are jointly and severally liable for attorneys' fees and costs incurred from efforts to collect the amounts due under the 2015 Note.  (*Id.* ¶¶ 6–19.)

The case was initially assigned to the Honorable Joseph F. Bianco.  By letter dated January 25, 2018, Plaintiff represented that Defendant Drabinsky had been served in accordance with the Hague Convention on November 1, 2017, but that Defendant Gottlieb had not been served because

he had moved.  (Dkt. 9.)  On May 22, 2018, Plaintiff requested a certificate of default as to Drabinsky, which was entered on June 4, 2018.  (Dkts. 10, 11.)  On July 14, 2018, Plaintiff moved for default judgment against Drabinsky.  (Dkt. 12.)  After being served with Plaintiff's motion for default judgment, Drabinsky, through counsel, appeared and contested the motion.  (*See* Dkts. 17–18, 20–23.)  Judge Bianco held a telephone conference on December 11, 2018, and denied the motion for default judgment.  (*See* Dkt. 31.)

On February 4, 2019, Drabinsky filed an Answer and asserted a crossclaim against Gottlieb for "contribution or indemnification."  (*See* Answer, Dkt. 34, ¶ 26.)  The case was then transferred to the undersigned and proceeded to discovery before the Honorable Roanne L. Mann.  (*See* 3/8/2019 Docket Entry.)  Thereafter, Drabinsky submitted documents showing that Gottlieb had been served in Canada on May 8, 2019, with copies of the Complaint and Drabinsky's Answer and Crossclaim in accordance with the Hague Convention.  (*See* Dkts. 39, 42.)

On August 9, 2019, Plaintiff requested a certificate of default as to Gottlieb, which was entered on August 14, 2019.  (*See* Dkts. 43, 44.)  On August 16, 2019, Drabinsky requested that default be entered against Gottlieb on the asserted crossclaim, which was done on August 26, 2019. (*See* Dkts. 45, 47.)

Plaintiff then sought to move for default judgment against Gottlieb (Dkt. 46), while Drabinsky indicated that he intended to defer moving for a default judgment with respect to his crossclaim against Gottlieb until Plaintiff's claims against Drabinsky had been resolved (Dkt. 48). On October 4, 2019, Plaintiff filed his motion for default judgment as to Gottlieb, which was referred to Judge Mann.  (*See* Dkts. 55; 10/7/2019 Docket Order Referring Motion.)  Judge Mann recommended that Plaintiff's motion for default judgment be granted in substantial part, and the Court adopted Judge Mann's recommendation in full.  *Nimkoff v. Drabinsky*, 2020 WL 3806146,

at *13 (E.D.N.Y. June 9, 2020), *report and recommendation adopted*, 2020 WL 3804458, at *1 (E.D.N.Y. July 7, 2020).  Accordingly, a default judgment was entered as to Defendant Gottlieb on July 7, 2020, awarding Plaintiff (1) $376,928.65 in unpaid principal under the 2015 Note; (2) interest on this unpaid principal of 12% per annum from August 26, 2015, compounded monthly, amounting to $283,349.40; (3) attorneys' fees totaling $5,253; and (4) costs of $200. (Dkt. 104.)

Around the same time, Plaintiff requested a pre-motion conference in regard to an anticipated motion for summary judgment against Defendant Drabinsky on the first count of the Complaint, *i.e.*, the claim for unpaid principal and interest under the 2015 Note.  (Dkt. 101.)  The Court determined that a pre-motion conference was unnecessary and set a briefing schedule for Plaintiff's partial summary judgment motion.  (*See* 7/10/2020 Docket Order; 7/16/2020 Docket Order.)  The motion was fully briefed on December 18, 2020.  (*See* Dkts. 112–17.)

## III.   Instant Motion

Plaintiff seeks summary judgment with respect to Defendant Drabinsky's liability for principal and interest due under the 2015 Note.  (*See* Notice of Motion, Dkt. 112, at ECF 1; *see also* Plaintiff's Memorandum of Law Supporting Motion for Summary Judgment on Count One of the Complaint ("Pl.'s Mem."), Dkt. 112-31, at 1.)  Drabinsky opposes summary judgment on two grounds: (1) Plaintiff has not satisfied his *prima facie* burden of establishing the existence of an enforceable promissory note; and (2) even if Plaintiff has satisfied his *prima facie* burden, Drabinsky is entitled to a hearing with respect to whether enforcement of the 2015 Note is unconscionable.  (*See* Defendant's Memorandum of Law Opposing Motion for Summary Judgment ("Def.'s Mem."), Dkt. 114, at 1–2, 6–21.)  Drabinsky also requests default judgment on his crossclaim against Gottlieb, or leave to file a motion for default judgment, in the event summary judgment against him is granted.  (*Id.* at 3 n.2.)

14

## DISCUSSION

### I.      Legal Standards

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (noting that summary judgment is about "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if the record evidence, viewed in the light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. at 248; *see also id.* at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor."). Moreover, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citation omitted). In other words, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphases in original).

The moving party bears the initial burden of "establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Once this initial burden is met, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis omitted) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be

15

evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration in original) (citation omitted).

Finally, although it is well-established that courts "liberally construe pleadings and briefs submitted by *pro se* litigants," *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (citing *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)), "a lawyer representing himself ordinarily receives no such solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) (collecting cases); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001) ("*[P]ro se* attorneys . . . typically 'cannot claim the special consideration which the courts customarily grant to *pro se* parties.'" (quoting *Harbulak v. County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981))).

## II.   Plaintiff Has Satisfied His *Prima Facie* Burden

"To establish prima facie entitlement to judgment as a matter of law with respect to a promissory note, a plaintiff must show the existence of a promissory note, executed by the defendant, containing an unequivocal and unconditional obligation to repay, and the failure by the defendant to pay in accordance with the note's terms." *Green Tree Servicing LLC v. Christodoulakis*, 136 F. Supp. 3d 415, 426–27 (E.D.N.Y. 2015) (brackets omitted) (collecting cases); *see also Crotona 1967 Corp. v. Vidu Bros. Corp.*, 925 F. Supp. 2d 298, 307 (E.D.N.Y. 2013) ("To make out a *prima facie* case under New York law, plaintiff must provide proof of the valid note and of defendant's failure, despite proper demand, to make payment." (internal quotation marks and citation omitted)).[10]   Here, Plaintiff has provided proof of the 2015 Note, which is attached to Plaintiff's motion papers, and there is no genuine dispute that Defendant

---

[10]   As the Court previously concluded, New York law governs the present contract claims, in light of the clear and unambiguous language of the 2015 Note, which provides that any action on the Note "is to be governed by the laws of the State of New York without regard to New York's choice of law rules." *Nimkoff*, 2020 WL 3806146, at *4 (quoting 2015 Note).

Drabinsky signed the 2015 Note.  (*See* 2015 Note, Dkt. 112-23, at ECF 2–3; *see also* Pl.'s 56.1, Dkt. 112, ¶ 25; Def.'s 56.1, Dkt. 113, ¶ 25.)  The 2015 Note unequivocally recognizes Drabinsky (and Gottlieb)

> to be justly indebted, as of August 26, 2015, jointly and severally, to [Plaintiff] as successor in interest to [the Nimkoff Firm] in the sum of THREE HUNDRED SEVENTY SIX THOUSAND NINE HUNDRED TWENTY EIGHT AND 65/100 DOLLARS (U.S. $376,928.65), lawful money of the United States, which sum [Drabinsky and Gottlieb] do hereby covenant to pay to [Plaintiff] or the executors, administrators, successors or assigns of [Plaintiff], together with interest, from August 26, 2015, at the rate of twelve percent (12%) per annum (one percent (1%) per month), compounded monthly, upon [Plaintiff]'s demand for such payment from [Drabinsky and Gottlieb].

(2015 Note, Dkt. 112-23, at ECF 2.)  Further, it is undisputed that Defendant Drabinsky has made no payments in response to Plaintiff's August 1, 2016 demand for payment under the Note.  (*See* Pl.'s 56.1, Dkt. 112, ¶¶ 28–29; Def.'s 56.1, Dkt. 113, ¶¶ 28–29, 196.)

Despite these undisputed facts, Drabinsky contends that Plaintiff has not satisfied his *prima facie* burden, arguing that "there is precedent for the court to dismiss Plaintiff's breach of contract claim *sua sponte* for failure to meet his burden."  (Def.'s Mem., Dkt. 114, at 7.)  But the precedent Drabinsky cites is inapposite because the business contracts in those cases materially differ from the promissory note at issue here.  In *Held & Hines LLP v. Hussain*—the main case on which Drabinsky relies (*see* Def.'s Mem., Dkt. 114, at 7–9)—a law firm entered into a legal services agreement with a client in which the firm would receive not only a retainer but also the equivalent of a 30% interest in the client's business.  *See* No. 16-CV-5273 (JSR) (SN), 2018 WL 4233809, at *2, *4 (S.D.N.Y. July 31, 2018), *report and recommendation adopted*, 2018 WL 4232912, at *1 (S.D.N.Y. Sept. 5, 2018).  The court determined that such a compensation arrangement "constituted a business transaction with a current client that triggered" certain ethical and professional responsibilities, including advising the client in writing of the desirability of seeking, and giving the client a reasonable opportunity to seek, the advice of independent legal counsel.  *Id.*

17

at *4 (citing N.Y. Rules of Pro. Conduct r. 1.8 cmt. 4C).   The 2015 Note is nothing like the arrangement in *Held & Hines*.   It is not a contract in which Plaintiff is seeking to enter into business with Drabinsky, or otherwise receive nonmonetary property for legal services, but rather a contract in which Drabinsky (and Gottlieb) simply acknowledged and promised to pay a monetary obligation to Plaintiff for past legal fees.   (*See* 2015 Note, Dkt. 112-23, at ECF 2–3.)   Thus, Drabinsky's reliance on *Held & Hines* is wholly inapposite and unavailing.   *See generally Held & Hines*, 2018 WL 4233809, at *4 ("The[] three requirements [of New York Rule of Professional Conduct 1.8(a)] must be met when the lawyer accepts an interest in the client's business or other nonmonetary property as payment of all or part of the lawyer's fee." (internal quotation marks and citation omitted)).

Drabinsky's other cases are similarly inapposite.   The contract before the New York Court of Appeals in *Greene v. Greene*, 436 N.E.2d 496, 498–500 (N.Y. 1982), was one where attorneys purportedly created a trust for their client and designated a member of the firm as a co-trustee. With respect to such contracts, an attorney "is bound to establish affirmatively that it was made by the client with full knowledge of all the material circumstances known to the attorney, and was in every respect free from fraud on [the attorney's] part, or misconception on the part of the client . . . ."   *Id.* at 499 (quoting *Whitehead v. Kennedy*, 69 N.Y. 462, 466 (1877)).   But the 2015 Note is not a trust agreement or any contract resembling one.   In the other case Drabinsky relies on, *Jacobson v. Sassower*, 489 N.E.2d 1283 (N.Y. 1985), the New York Court of Appeals determined that an attorney could not enforce a certain provision in a fee agreement because the provision was ambiguous.   *Jacobson* too is obviously inapposite.   Here, the 2015 Note is not ambiguous: it plainly provides that Defendant Drabinsky is indebted to Plaintiff in the sum of

$376,928.65 and must pay that amount, with 12% annual interest compounded monthly, upon Plaintiff's demand.  (*See* 2015 Note, Dkt. 112-23, at ECF 2.)

In short, Plaintiff has provided proof of an executed promissory note containing an unequivocal obligation to pay on demand, and it is undisputed that Drabinsky has failed to pay despite Plaintiff's demand to do so.  (*See* Pl.'s 56.1, Dkt. 112, ¶¶ 27–29; Def.'s 56.1, Dkt. 113, ¶¶ 27–29, 196.)  Accordingly, Plaintiff has satisfied his *prima facie* burden.  *See Green Tree Servicing*, 136 F. Supp. 3d at 426–27; *Crotona 1967 Corp.*, 925 F. Supp. 2d at 307.

## III.   Drabinsky's Unconscionability Defense Fails as a Matter of Law

"Once a prima facie claim to recover on a promissory note is established, 'the burden then shifts to the defendants to establish by admissible evidence the existence of a triable issue of fact with respect to a bona fide defense.'"  *Green Tree Servicing*, 136 F. Supp. 3d at 430 (brackets omitted) (quoting *Imperial Cap. Bank v. 11-13-15 Old Fulton D, LLC*, 930 N.Y.S.2d 267, 269 (N.Y. App. Div. 2011)).  Drabinsky asserts a defense of unconscionability.  (*See* Def.'s Mem., Dkt. 114, at 12–21.)

"The doctrine of unconscionability seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties."  *NML Cap. v. Republic of Argentina*, 621 F.3d 230, 237 (2d Cir. 2010) (quoting *United States v. Martinez*, 151 F.3d 68, 74 (2d Cir. 1998)).  Under New York law, a contract is unconscionable when it "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [*sic*] according to its literal terms."  *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988) (citation omitted); *see also* 22 N.Y. Jur. 2d Contracts § 146 (2021) ("The concept of 'unconscionability' is reserved for the type of agreement so one-sided that it shocks the conscience and confounds the judgment of any person of common sense, such that no individual in his or her senses and not under a delusion would make on the one hand,

and as no honest or fair person would accept, on the other."). Establishing unconscionability "generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Gillman*, 534 N.E.2d at 828 (internal quotation marks and citations omitted); *accord NML Cap.*, 621 F.3d at 237.

      "The determination of unconscionability is a matter of law for the court to decide." *I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 211 (S.D.N.Y. 2015) (quoting *Simar Holding Corp. v. GSC*, 928 N.Y.S.2d 592, 595 (N.Y. App. Div. 2011)). But even "[w]hile decisions about unconscionability are for the court to decide as a matter of law, the parties must be afforded a reasonable opportunity to present evidence as to a contract term's commercial setting, purpose and effect to aid the court in making the determination." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 786–87 (2d Cir. 2003) (internal quotation marks and citation omitted); *see also Simar Holding Corp.*, 928 N.Y.S.2d at 595–96 ("Where there is doubt . . . as to whether a contract is fraught with elements of unconscionability, there must be a hearing where the parties have an opportunity to present evidence with regard to the circumstances of the signing of the contract, and the disputed terms' setting, purpose and effect." (alteration in original) (citations omitted)). "However, where the significant facts germane to the unconscionability issue are essentially undisputed, the court may determine the issue without a hearing." *Simar Holding Corp.*, 928 N.Y.S.2d at 596 (internal quotation marks, citations, and brackets omitted); *accord Solovsky*, 135 F. Supp. 3d at 211.

Drabinsky presents no material issue that warrants a hearing, and the Court concludes, based on the undisputed facts in the record, that neither the procedure leading to the execution of the 2015 Note nor the substance of the 2015 Note renders it unconscionable.

With respect to procedural unconscionability, there is no dispute that at the time the 2015 Note was executed Plaintiff was a licensed attorney, and Drabinsky was a theater producer and the former CEO of a theatrical entertainment company, Livent, Inc. (*See* Def.'s 56.1, Dkt. 113, ¶¶ 47–49, 58.) Indeed, Plaintiff told Drabinsky during their phone conversation on September 21, 2015, the day before Drabinsky signed the 2015 Note, "[Y]ou're still Garth Drabinsky," to which Drabinsky replied, "Well, that may be . . . , but if I am still Garth Drabinsky, then even half a loaf is a good loaf." (*Id.* ¶ 158; *see also* Nimkoff Dep., Dkt. 116-12, at Tr. 164:20–25.) It is also undisputed that Drabinsky was represented by independent counsel, John Koch, who notarized the 2015 Note.[11] (*See* Pl.'s 56.1, Dkt. 112, ¶¶ 21–25; Def.'s 56.1, Dkt. 113, ¶¶ 21–25; *see also* 2015 Note, Dkt. 112-23, at ECF 1–3.) Notably, the 2015 Note followed on a 15-year relationship between the parties during which Plaintiff and his firm represented Drabinsky and Gottlieb in connection with several securities matters. Moreover, everyone agrees that—apart from capitalizing the interest accrued under the 2009 Note, *i.e.*, adding the accrued interest to the principal—the basic terms of the 2015 Note are the same as those of the 2009 Note that Drabinsky signed, and the 2015 Note came about simply because the statute of limitations on the 2009 Note was about to expire. (*See* Def.'s 56.1, Dkt. 113, ¶¶ 150–53; *see also* 2009 Note, Dkt. 112-15, at

---

[11] Relying on *Held & Hines*, discussed above, Drabinsky argues that the Court should not give weight to the fact that Koch notarized the 2015 Note, "because whether or not Mr. Drabinsky actually consulted with an attorney is not the standard." (Def.'s Mem., Dkt. 114, at 23.) As already explained, *Held & Hines* is inapposite here, and the Court finds the fact that Drabinsky evidently consulted with his attorney in connection with the 2015 Note to be extremely relevant to the issue of procedural unconscionability.

ECF 1–2; 2015 Note, Dkt. 112-23, at ECF 2–3.)  In short, this clearly is not a case where one party

is inexperienced and there is a gross "disparity in bargaining power."  *See Gillman*, 534 N.E.2d at

828.  Rather, the parties here are highly sophisticated and had a long history of dealings with each

other.  "New York courts have found that procedural unconscionability does not exist where 'the

party complaining is commercially sophisticated.'"  *Bentivoglio v. Event Cardio Grp., Inc.*, No.

18-CV-2040 (PKC), 2021 WL 736811, at *6 (S.D.N.Y. Feb. 24, 2021) (quoting *SOL Grp. Mktg.*

*Co. v. Lines*, No. 14-CV-9929 (SHS), 2016 WL 205444, at *7 (S.D.N.Y. Jan. 15, 2016)).  Again,

"[t]he doctrine of unconscionability seeks to prevent sophisticated parties with grossly unequal

bargaining power from taking advantage of less sophisticated parties."  *NML Cap.*, 621 F.3d at

237.  No reasonable factfinder could find that such circumstances exist here.

Drabinsky nonetheless argues that the 2015 Note is procedurally unconscionable because,

at the time he signed the 2015 Note, he was undergoing treatment for stage IV cancer and was still

under indictment in the United States.  (*See* Def.'s Mem., Dkt. 114, at 14–15.)  This argument is

unavailing.  Drabinsky cites no authority holding that difficult personal circumstances alone are

sufficient to render a contract procedurally unconscionable.  And though Drabinsky alleges that

his medical treatments caused "lasting psychiatric effects" (*id.* at 14; *see also* Def.'s 56.1, Dkt.

113, ¶¶ 127, 142), he provides no basis to find that those effects hampered his ability to make a

rational decision.  *Cf. Dabriel, Inc. v. First Paradise Theaters Corp.*, 952 N.Y.S.2d 506, 510 (N.Y.

App. Div. 2012) (rejecting a party's argument that chemotherapy treatment established procedural

unconscionability, given that there was nothing to show that the chemotherapy "impeded [the

party's] ability to act rationally in conducting business, or that [the other party] took advantage of

[this] physical condition").  In fact, the two phone conversations Drabinsky had with Plaintiff in

September 2015 before signing the 2015 Note, considered in their entirety,[12] indicate that Drabinsky well understood the situation and his various options.  (*See* Def.'s 56.1, Dkt. 113, ¶¶ 157–58.)  That none of those various options turned out to be particularly palatable does not make the negotiation process unconscionable.  Any misfortunes Drabinsky was experiencing at the time he signed the 2015 Note do not excuse his obligation to pay Plaintiff and his firm, and Plaintiff neither contributed to nor took advantage of Drabinsky's circumstances in negotiating the 2015 Note.  Indeed, the events leading up to the execution of the 2015 Note demonstrate quite the opposite, namely, that Plaintiff exercised restraint and forbearance in not demanding payment sooner from Drabinsky and Gottlieb.[13]  Under the facts and circumstances here, the Court finds no basis to conclude that the formation or execution of the 2015 Note was procedurally unconscionable.[14]

Nor is the 2015 Note substantively unconscionable.  The question of substantive unconscionability turns on whether the terms of the bargain "were unreasonably favorable to the party against whom unconscionability is urged."  *Gillman*, 534 N.E.2d at 829 (citation omitted).  As an initial matter, there is nothing unconscionable about Plaintiff seeking to obtain long-overdue payment for his services or interest to compensate Plaintiff for any continuing delay in getting his money.  Drabinsky, however, focuses on the provision in the 2015 Note that provides for

---

[12] Drabinsky expressly urges the Court to listen to the entire recording or read the transcript of the two September 2015 calls.  (*See* Def.'s 56.1, Dkt. 113, ¶¶ 15–16, 21.)  The Court has done both.

[13] Though this post-dates the 2015 Note, Plaintiff showed similar restraint in attempting to collect the debt from Drabinsky and Gottlieb without filing a lawsuit and only initiating suit after making a demand and waiting for a period of time.  (*See* Pl.'s 56.1, Dkt. 112, ¶¶ 28–32; Def.'s 56.1, Dkt. 113, ¶¶ 28–32.)

[14] The Court understands that Defendant Drabinsky is suffering from serious health conditions, but the Court must apply the law and assess the facts impartially and dispassionately.

compound interest at a rate of 12% per annum, compounded monthly.  (Def.'s Mem., Dkt. 114, at 16–17.)  He argues that "compounding of interest violates New York public policy."  (*Id.* at 16 (citing *Giventer v. Arrow*, 37 N.Y.2d 305, 308 (N.Y. 1975)).)  But the *Giventer* decision on which Drabinsky relies predates the enactment of New York General Obligations Law § 5-527, which makes compound interest provisions in loans and other agreements enforceable.  *See* N.Y. Gen. Oblig. Law § 5-527(1); *see also Spodek v. Park Prop. Dev. Assocs.*, 759 N.E.2d 760, 762 (N.Y. 2001).  And though § 5-527 includes a carve-out for "any loan or other financing agreement where the original principal debt is in an amount of two hundred fifty thousand dollars or less," N.Y. Gen. Oblig. Law § 5-527(2), as the Court has already determined, the original principal on the 2015 Note was more than $250,000, *see Nimkoff*, 2020 WL 3806146, at *6 (finding that the 2015 Note "provides for repayment of the principal amount of $376,928.65").  Drabinsky contends, without citation to any authority, that the Court should look to the "original" principal under the 2009 Note ($185,969.45) and "not be limited to only the 2015 note under the circumstances." (Def.'s Mem., Dkt. 114, at 16–17; *see also* 2009 Note, Dkt. 112-15, at ECF 1.)  But the 2015 Note—the note at issue—is unambiguous with respect to the amount of principal and interest.  (*See* 2015 Note, Dkt. 112-23, at ECF 2.)  "Where the contract is unambiguous, courts must effectuate its plain language."  *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002) (collecting cases); *see also Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) ("The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." (citation omitted)).

Even if the Court were to look beyond the four corners of the 2015 Note, there is no reason that the Court's consideration would stop at the 2009 Note.  Drabinsky had significant outstanding

24

debts to Plaintiff or Plaintiff's firm well before 2009 (*see* Pl.'s 56.1, Dkt. 112, ¶¶ 8–11), and there is no indication that any interest was accruing on these debts before 2009.  In fact, the 2005 Note signed by Drabinsky and Gottlieb expressly provided for "no interest."  (*See* 2005 Note, Dkt. 112-12, at ECF 2, 5–6.)  That Plaintiff began charging interest on Drabinsky's outstanding debts after those debts had remained outstanding for several years was not unreasonable.  Thus, whether the Court considers the totality of the circumstances or simply the 2015 Note itself, the compound interest provision in the 2015 Note is not "unreasonably favorable" to Plaintiff.  *See Gillman*, 534 N.E.2d at 829.  Same with the unambiguous provisions in the 2015 Note relating to recovery of attorneys' fees and choice of law.  *Cf. NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) ("Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear." (citing, *inter alia*, *Hooper Assocs., Ltd. v. AGS Computs., Inc.*, 548 N.E.2d 903, 904–05 (N.Y. 1989))); *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 641 (2d Cir. 2016) ("Generally, New York courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction." (brackets omitted) (quoting *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006))).

Thus, the undisputed facts establish that the 2015 Note is not substantively unconscionable.

\*       \*       \*

Overall, Drabinsky raises no genuine disputes as to any material fact.  Based on the undisputed facts, the Court concludes that the 2015 Note is neither procedurally nor substantively unconscionable, and is enforceable, with respect to Drabinsky.  As it is undisputed that Drabinsky has made no payments in response to Plaintiff's demand for payment pursuant to the 2015 Note

(*see* Pl.'s 56.1, Dkt. 112, ¶ 29; Def.'s 56.1, Dkt. 113, ¶¶ 29, 196), Plaintiff is entitled to recover from Drabinsky $376,928.65 in unpaid principal plus interest of 12% per annum, compounded monthly, from August 26, 2015, until the entry of judgment.

## CONCLUSION

Plaintiff's motion for summary judgment on Count One of the Complaint as to Defendant Drabinsky is granted.  Plaintiff is awarded judgment against Defendant Drabinsky in the sum of $376,928.65 in unpaid principal with interest of 12% per annum, compounded monthly, from August 26, 2015, until the entry of judgment.  Defendant Drabinsky's request for a hearing with respect to Plaintiff's enforcement of the 2015 Note is denied.  Defendant Drabinsky is granted leave to file a motion for default judgment with respect to his crossclaim against Defendant Gottlieb.  Defendant Drabinsky shall do so by November 30, 2021.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2021
        Brooklyn, New York